## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LYDON MILLWRIGHT SERVICES, INC.,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ERNEST BOCK & SONS, INC.,** | : | |
| **Defendant.** | : | **NO. 11-7009** |

## M E M O R A N D U M

**GENE E.K. PRATTER, J.**                                                    **MAY 7, 2013**

In this unfortunate construction project melee, Lydon Millwright Services, Inc.

("Lydon") has sued Ernest Bock & Sons, Inc. ("Bock") for breach of contract and unjust

enrichment.  In response, Bock moves for summary judgment.  Bock asks the Court to rule as a

matter of law that Lydon's claims are barred by releases that Lydon, as Bock's subcontractor,

signed and by a "pay-if-paid" provision in the parties' contract.  For the following reasons, the

Court denies the motion.

## I.  Factual Background[1]

The Philadelphia International Airport currently is undertaking a construction project that

includes the installation of a baggage handling system.  When this lawsuit commenced, Bock

was the general contractor for the project.  In March 2008, Lydon had contracted with Bock and

agreed to install the mechanical portion of the baggage handling system.

Lydon and Bock signed a Purchase Order that required Lydon to submit a "monthly

release of liens and claims" with its monthly applications for payments.  Over the course of the

project, Lydon submitted 54 such applications with releases to Bock.  The parties dispute

---

[1] The facts set forth in this section are undisputed by the parties.

1

whether these releases preclude Lydon from suing Bock. The Purchase Order also contained a

"pay-if-paid" clause that provides:

> "Payment by Owner to the General Contractor for the work/materials invoiced by
> the Subcontractor . . . shall be a condition precedent to General Contractor's
> obligation to pay Subcontractor. . . . Accordingly, Subcontractor . . . agrees and
> understands that it shall bear the risk of non-payment by the Owner and shall be
> entitled to no compensation from the General Contractor in the event of non-
> payment by the Owner for its work/materials."

The relationship between the City and Bock has deteriorated to the point of heated litigation

between them in the Court of Common Pleas. Bock is no longer working on the project. For the

foreseeable future, amicable resolution of the myriad of disputes and claims is not expected to

take off any time soon.

The baggage handling system portion of the project was segmented into five phases. For

each phase, third-party defendant G&T Conveyor Company was expected to deliver baggage

handling system equipment to Lydon. Following these deliveries, Lydon was to install the

baggage handling system, other subcontractors hired by Bock were to connect electrical power to

the system, and Lydon was then to perform a mechanical check of the system.

The airport project was originally scheduled for completion on November 20, 2009.

However, the project has suffered numerous delays, and the project has not been completed. In

January 2009, Bock and G&T met to discuss the delays in the project. Bock attributed the delays

to the City of Philadelphia and G&T's failures to make timely deliveries of equipment. G&T,

however, stated that Bock was at least partially responsible for the delays because Bock failed to

effectively manage and coordinate the project. Neither Bock nor G&T attributed the delays to

Lydon.

Around this same time in early 2009, Lydon and Bock also discussed the delays in the project. Lydon told Bock that it was preparing a detailed schedule analysis that would document the delays caused by others on the project, as well as Lydon's efforts to mitigate those delays. In response, Bock stated that such analysis was unnecessary, and that Bock simply wanted Lydon to provide a list of issues that had delayed and/or were delaying Lydon's work on the project. Bock explained that it would incorporate Lydon's delays into own schedule analysis.

Lydon continued to work on the project in 2009 and 2010. Significant delays occurred during those years, but there is no allegation that Lydon was responsible for these delays. On November 18, 2009, G&T filed a complaint in state court seeking a declaration that Bock was responsible for the delays in the project. Bock filed a counterclaim against G&T for breach of contract on August 12, 2010.

In early 2011, Lydon and Bock met in Philadelphia to discuss their claims for delay damages related to the project. At the meeting, Bock proposed that Lydon join it in suing the City of Philadelphia and other entities involved in the project. On May 4, 2011, Bock sued Lydon, G&T, and the City of Philadelphia in state court. Bock's suit sought a declaratory judgment with respect to the liability and indemnification obligations of G&T, the City of Philadelphia, and Lydon. The state court subsequently dismissed Bock's claims against G&T as duplicative of its pending counterclaim, and dismissed Bock's claims against Lydon on ripeness grounds.

On September 15, 2011, Lydon submitted a Request for Equitable Adjustment ("REA") to Bock. The REA sought to increase the Purchase Order by $1,961,775 because of impacts on Lydon's costs incurred during the project. Bock has yet to receive any payment from the City of Philadelphia for Lydon's delay damages.

## II.  Procedural Background

On November 9, 2011, Lydon filed the original complaint in this action, invoking the Court's diversity jurisdiction.  The complaint alleged that Bock breached its contract with Lydon by causing delays in Lydon's work.  Count 1 of Lydon's complaint is for breach of contract and Count 2 is for unjust enrichment.

On January 24, 2012, Bock filed a third-party complaint against the City of Philadelphia, G&T Conveyor Company, and Mulhern Electric Company.  The third-party complaint includes allegations that all three third-party defendants breached their respective contracts with Bock by causing delays in the airport contract.  On March 2, 2012, G&T filed a motion to stay the third-party litigation, on the grounds that in the Philadelphia Court of Common Pleas it was already litigating the issues newly alleged in the federal court third-party complaint.  The Court subsequently granted the motion, which was joined by the other third-party defendants, and, for the time-being, stayed the third-party litigation.

Bock has moved for summary judgment against Lydon's claims.  Bock argues that: (i) Lydon's claims are barred by a release; and (ii) a "pay-if-paid" provision bars Lydon from recovering damages against Bock.  The Court permitted supplemental discovery on issues related to Bock's motion for summary judgment.  The parties recently submitted supplemental briefing based on their additional discovery, as well as another round of briefing based on the Court's questions during the recent oral argument.

## III.  Standard of Review

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on

which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).  Under Rule 56, the Court must view the evidence presented in the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255.  However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record believed to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**IV. Discussion**

*A. The Parties' Release*

    **1. Relevant Law**

In Pennsylvania, a release is a contract, and its interpretation is "governed by the rules of contract construction." *See G.R. Sponaugle & Sons, Inc. v. Hunt Constr. Grp., Inc.*, 366 F. Supp. 2d 236, 242 (M.D. Pa. 2004). Here, the parties dispute whether Pennsylvania contract law permits the Court to rely on their course of conduct to interpret Lydon's release. Although the parties did not cite it in their initial briefs, the case that, for this Court, authoritatively sets forth the law on this point is *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79 (3d Cir. 2001).

In *Bohler-Uddeholm*, the Third Circuit Court of Appeals acknowledged that "Pennsylvania law on contract interpretation and ambiguity is somewhat complicated[.]" *Id.* at 92. Despite this complexity, courts agree that "[t]he fundamental rule in contract interpretation is to ascertain the intent of the contracting parties," *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006), and "Pennsylvania contract law begins with the firmly settled point that the intent of the parties to a written contract is contained in the writing itself," *Bohler-Uddeholm*, 247 F.3d at 92 (citations and quotations omitted). Therefore, "a contract that is unambiguous on its face must be interpreted according to the natural meaning of its terms, unless the contract contains a latent ambiguity, whereupon extrinsic evidence may be admitted to establish the correct interpretation." *Id.* at 96.

*Bohler-Uddeholm* also notes that restrictions exist as to when a party may argue that a contract contains a latent ambiguity. In particular, "*a claim of latent ambiguity must be based on a 'contractual hook': the proffered extrinsic evidence must support an*

*alternative meaning of a specific term or terms contained in the contract, rather than*

*simply support a general claim that the parties meant something other than what the*

*contract says on its face.*" *Id.* (emphasis supplied).  In other words, a party arguing that

an unambiguous release contains a latent ambiguity must "offer[] a reasonable alternate

interpretation of [the release]," *see id.* at 100, and its extrinsic evidence "must be about

the parties' linguistic reference rather than about their expectations," *see id.* at 96

(internal quotations omitted).

## 2.  Relevant Facts

During the course of the airport project, Lydon submitted 54 releases to Bock with its

monthly payment applications.  For example, on May 12, 2011, Lydon signed one of these

releases, which stated:

> 1.  In consideration of the sum of $27,667.51 and other good and valuable
> consideration described herein, the undersigned does hereby release all . . . claims
> as against the Contractor . . . resulting or arising from labor . . . and/or materials,
> subcontract work, equipment or other work, rentals, services or supplies
> heretofore furnished by or on behalf of the undersigned in and for the
> construction, design, improvement, alteration, additions  to or repair of the above
> described Project including but not limited to any claims arising from delay . . .
> incurred by the undersigned on the Project from the beginning of time thru the
> period ending March 31, 2011.[2]

> 6.  In addition to the foregoing, this instrument shall constitute a complete
> release of all . . . claims. . . of the undersigned against the Contractor . . . in law or
> in equity arising out of or pertaining to the above referenced Project that the
> undersigned may have, whether known or unknown, through the date of this
> release (which includes the period above).  To the extent that there are claims that
> the undersigned wishes to reserve and except out of this release, they are detailed
> with specificity on the reverse side of this release.

---

[2] In its complaint, Lydon only seeks to recover delay damages that accrued through
February 28, 2011.

Bock paid, and Lydon accepted, the $27,667.51 consideration set forth in the release. Moreover, Lydon did not "except out" any claims from the release in accordance with Paragraph 6.

Although the language of the release is unambiguous, Lydon argues extensively that the parties' conduct vis-à-vis each other demonstrates that they did not intend for the release to bar Lydon's claims. To cite a few examples, Lydon's President, James E. Lydon, Jr., has stated in an affidavit that Bock personnel suggested to him that Bock believed Lydon's claims had merit and that Mr. Lydon should document the delays suffered by Lydon during the project. Understandably, Lydon argues that such conversations and requests would make little sense if Lydon periodically was releasing its claims. Mr. Lydon also claims that he was told in March 2011 by George Pallas, Bock's attorney, that Bock would "take care" of his company if it entered a "liquidating agreement" and released its claims against Bock. Again, this alleged conversation would make little sense if Lydon had already released its claims. Furthermore, Lydon notes that Bock's May 4, 2011 state court complaint did not seek a declaration that Lydon had released its claims but did seek indemnification from G&T and the City of Philadelphia for Bock's exposure to Lydon.

It appears at least some of the facts set forth in the preceding paragraph are disputed. For instance, Mr. Pallas has stated in an affidavit that he does not recall discussing the issue of releases with Lydon, and Anthony DePascale, Bock's Vice President, testified at his deposition that he believed Lydon was planning on seeking delay damages from parties other than Bock. More to the point, the relevancy of these disputed facts hinges on whether *Bohler-Uddeholm* permits the Court to consider the parties' course of conduct in the first place.

### 3. Application

The language of the release that Lydon signed on May 12, 2011 unambiguously

relinquishes all the claims that accrued against Bock through March 31, 2011.  Notably, Lydon's

briefs do not identify a "contractual hook" or proffer an alternative interpretation for the release

language.  Instead, Lydon attempts to use the parties' course of conduct to "claim that the parties

meant something other than what the [release] says on its face."  *See id.* at 96.  In such a

situation, *Bohler-Uddeholm* precludes the Court from considering Lydon's extrinsic evidence in

order to ignore the plain language of the release.  *See id.*  Therefore, in the absence of waiver or

estoppel to block Bock's argument here, Lydon's release bars it from pursuing its claims against

Bock.[3]  *See Sauer Inc. v. Honeywell Bldg. Solutions SES Corp.*, 742 F. Supp. 2d 709, 719 (W.D.

Pa. 2010) ("[T]he releases . . . submitted . . . in connection with [the subcontractor's] progress

payment applications contained unambiguous language, and . . . such language purports to bar

[the subcontractor's] claims against [the contractor].  *For this reason, the Court need not look*

*beyond the language of the releases in determining the intent of the contracting parties at the*

*time that the releases were executed*.") (emphasis supplied); *G.R. Sponaugle*, 366 F. Supp. 2d at

242 n.6 (holding same); *Taylor v. Solberg*, 778 A.2d 664, 667 (Pa. 2001) ("In Pennsylvania, it is

---

[3] At oral argument, Lydon disclaimed the view that interpreting the releases according to their plain language would lead to an absurd result.  *See* Transcript of Oral Argument ("Transcript") at 42:16-19 (Q: "You are not saying that the plain language interpretation of these documents, or these releases, is absurd, are you?  A: No.").  After the Court identified *Bohler-Uddeholm* for the parties, Lydon attempted to backtrack from this position in its post-argument brief.  *See* Docket No. 49 at 8; *see also Bohler-Uddeholm*, 247 F.3d at 96 ("[A] court can consider an alternative interpretation of a facially unambiguous contract term when the plain meaning interpretation of the contract would lead to an absurd and unreasonable outcome.").  Regardless of the inconsistency of Lydon's positions, the Court finds that interpreting the releases according to their plain language would not create an absurd result even though it might lead to a result quite undeserved by one party to the agreement.

well settled that the effect of a release is to be determined by the ordinary meaning of its

language.").[4]

## B. *Waiver of the Release*

### 1. Relevant Law

Under Pennsylvania law, "waiver is a voluntary and intentional abandonment or

relinquishment of a known right. Waiver may be established by a party's express declaration or

by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract

provisions as to leave no opportunity for a reasonable inference to the contrary." *Sabatini v. ITS*

*Amore Corp.*, 455 F. App'x 251, 256 (3d Cir. 2011) (citations and quotations omitted); *see also*

*Brown v. City of Pittsburgh*, 186 A.2d 399, 401 (Pa. 1962) (noting that waiver requires "a clear,

unequivocal and decisive act" that evidences a "purpose to surrender" a right). A party claiming

the benefit of an implied waiver must show that he was "misled, *to his prejudice*, into the honest

belief that such waiver was intended[.]" *Id.* (emphasis in original). In determining whether a

waiver occurred, courts focus on the conduct of the party that allegedly waived its right. *See id.*

at 401 n.3. The Third Circuit Court of Appeals has stated that "[o]rdinarily, the question of

waiver is a question of fact for a jury." *See Sabatini*, 455 F. App'x at 256.

In *Sabatini*, a restaurant leased a parking lot from two plaintiffs, and the lease obligated

the restaurant to not modify the lot without prior written permission from the plaintiffs. *See* 455

---

[4] At oral argument, Lydon could not proffer a reasonable alternative interpretation of the release, and its attempt to do so in its post-argument brief is not credible. *See* Transcript at 40:2-8 (Q: "So what are you saying I can find in this document to conclude that it's [not] a release? A: Well, we maintain, I guess, Judge, that you are not – in forming a judgment as to what the release said, you are not confined to the four corners of the instrument."). Moreover, Lydon's reliance on *Bethlehem Steel Corp. v. United States*, 270 F.3d 135 (3d Cir. 2001), and *Pioneer Construction Co. v. Pride Enterprises, Inc.*, No. 07-994, 2009 WL 4429802 (M.D. Pa. Nov. 27, 2009) (Vanaskie, J.), fails because *Bethlehem* was decided under federal contract law rather than Pennsylvania law, while *Pioneer* relied on *Bethlehem* without discussing *Bohler-Uddeholm*. *See Bethlehem*, 270 F.3d at 139; *Pioneer*, 2009 WL 4429802, at *7.

F. App'x at 253.  The restaurant proceeded to modify the parking lot without obtaining such permission, at which point the plaintiffs brought suit for ejectment.  *See id.* at 254.  The Third Circuit Court of Appeals denied the plaintiffs' motion for summary judgment because an issue of fact existed as to whether the plaintiffs waived their right to terminate the lease.  *Id.* at 256.  In particular, the court noted that the parties disputed whether the plaintiffs knew and approved of the restaurant's modifications to the parking lot.  *See id.*

Additionally, one court within this district has addressed the issue of implied waiver in a dispute between a contractor and a subcontractor.  *See Quinn Constr., Inc. v. Skanska USA Bldg., Inc.*, 730 F. Supp. 2d 401 (E.D. Pa. 2010).  In *Quinn*, a subcontractor signed releases "each time it requested payment from [a general contractor]," but then sued that general contractor for overtime wages.  *See id.* at 418.  The court held that "the plain language of the releases bars [the subcontractor's] claims for overtime wages," but also held that "the releases do not entitle [the general contractor] to summary judgment . . . because a genuine issue of fact exists as to whether [the general contractor] waived enforcement of the release language[.]"  *See id.*  The court found that a jury should decide the issue of waiver because the subcontractor's evidence showed that: (i) when presented with the overtime claims, the general contractor did not assert that those claims were barred by the releases; (ii) the general contractor's spreadsheet did not indicate the overtime claims were released; and (iii) "most significantly," the contractor tried to secure payment for the subcontractor's claims from the project owner.  *See id.* at 418 n.9.

## 2.  Relevant Facts

Here, Lydon asserts that the litany of evidence it has presented creates an issue of fact as to whether Bock impliedly waived its right to rely on the releases.  This evidence is summarized as follows:

- Lydon submitted its first signed release to Bock on March 21, 2008. This release contains language *identical* to that in the May 12, 2011 release on which Bock relies.

- After Lydon began submitting its releases, Bock told James Lydon that it wanted to "team up" with his company and "pursue claims jointly" against other entities involved in the project. Bock also "promised to incorporate" Lydon's delay damages into the claims Bock would be making against the City of Philadelphia and other entities.

- On January 27, 2009, Anthony DePascale, Bock's Vice President, told James Lydon that Bock was preparing a "comprehensive schedule analysis" that would document the delays suffered by "both Lydon and Bock."

- During 2009 and 2010, Bock's representatives told James Lydon that Bock would "take care" of Lydon with respect to its claim for delay damages.

- In early 2011, James Lydon met with senior personnel at Bock and informed them that his company was considering suing Bock for delay damages. Bock responded by proposing that Lydon "liquidate" its claims against Bock and formally "join forces" to sue the other entities involved in the project.

- In March 2011, James Lydon spoke with George Pallas, Bock's attorney. Mr. Pallas proposed that Lydon release its claims against Bock and enter a "liquidating agreement" with Bock by which the two companies would proceed together against the other entities.

- Bock's 2011 state court complaint sought a declaration that the City and G&T are liable to Bock for any claims that Lydon has against it.

- Bock attempted to settle with Lydon after Lydon filed its Request for Equitable Adjustment and the complaint in this action.

- Prior to this lawsuit, Bock never informed Lydon that its releases precluded it from pursuing claims against Bock.

### 3. Application

Given the aforementioned evidence, and bearing in mind that the Third Circuit Court of Appeals has held that "[o]rdinarily, the question of waiver is a question of fact for a jury," *see Sabatini*, 455 F. App'x at 256, the Court finds that an issue of fact exists as to whether Bock impliedly waived its right to rely on the releases. A jury could reasonably find that Bock's actions in promising to help Lydon pursue its claims, and in trying to reach a settlement with Lydon, are inconsistent with an intent to rely on the releases, and that Bock thus waived the

benefit of those releases.  The Court notes that a factfinder could determine that Mr. Pallas's

alleged request for Lydon to relinquish its claims implied that Bock would not use the releases to

bar those claims.  Similarly, by repeatedly promising to help Lydon pursue its claims, Bock

arguably indicated that it would not rely on the releases to preclude those claims.  Whether such

actions rise to the level of implied waiver is an issue for a jury to determine.  *See Quinn*, 730 F.

Supp. 2d at 418 n.9 (holding that a jury should determine whether a contractor waived the

benefits of a release by attempting to secure payment for its subcontractor's claims).

Nonetheless, Bock advances several arguments as to why a jury could not find that it

impliedly waived the benefits of the releases.  First, Bock asserts that "[t]he parties agree that

when a 'waiver' defense is raised, the courts' review is limited to an analysis of the 'waiving'

party's conduct **after** the relevant . . . release has been executed."   In other words, Bock's theory

is that the Court may only consider its post-May 12, 2011 conduct in deciding whether it waived

its rights, because Lydon signed the last relevant release in this matter on May 12, 2011.

However, this argument makes little sense under the facts of this case, since the releases signed

prior to May 12, 2011 contained the exact same language as the May 12, 2011 release.

Second, Bock argues that almost all of Lydon's evidence pertaining to the parties' 2011

communications is barred by Federal Rule of Evidence 408, which precludes the use of "conduct

or a statement made during compromise negotiations" in order to "prove or disprove the validity

. . . of a disputed claim."  Rule 408's strictures apply if two parties have "a mere difference of

opinion," even if their dispute has "not crystallize[d] to the point of threatened litigation."

*ECEM European Chem. Mktg. B.V. v. Purolite Co.*, 451 F. App'x 73, 77 (3d Cir. 2011) (citations

and quotations omitted); *see also id.* ("[W]hen in doubt, the district court should err on the side

of excluding compromise negotiations.").  Courts may admit evidence of settlement

communications "for another purpose, such as proving a witness's bias or prejudice, [or] negating a contention of undue delay[.]"  Fed. R. Evid. 408(b).

Bock's briefing fails to identify any cases in which a court excluded evidence of settlement discussions in a situation analogous to this case.  However, the Second Circuit Court of Appeals addressed Rule 408 in *PRL USA Holdings, Inc. v. U.S. Polo Ass'n*, 520 F.3d 109 (2d Cir. 2008).  *PRL* was a trademark infringement suit in which the defendants asserted the affirmative defense of estoppel by acquiescence, and supported this defense by proffering evidence that the plaintiff agreed to their use of the contested marks during settlement discussions.  *See id.* at 111-12.  The Second Circuit Court of Appeals held that Rule 408 did not bar such evidence, because the evidence related "to the affirmative defense of estoppel by acquiescence, which depend[s] on issues distinct from the elements of the claim of infringement."  *See id.* at 115.  Similarly, Lydon is offering evidence of settlement discussions to negate Bock's defense of release, not to directly support the underlying breach of contract claim. Therefore, Rule 408 does not preclude Lydon from introducing settlement communications.  *See Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 484 (7th Cir. 2000) ("It would be an abuse of Rule 408 to allow one party during compromise negotiations to lead his opponent to believe that he will not enforce applicable time limitations and then object when the opponent attempts to prove the waiver of time limitations."); 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5314 (noting that use of compromise evidence is permissible in "cases in which the compromise activities result in a waiver of or an estoppel to assert some procedural or substantive right").

Third, Bock argues that, prior to 2011, it believed Lydon wanted to make claims against the other parties involved in the project, rather than against Bock itself.  Therefore, Bock argues

that it had no notice of Lydon's claims prior to 2011, and that it could not have waived its rights

prior to receiving such notice.  The problem with this position is that Lydon was in privity of

contract with Bock, not some other entity.  Therefore, Bock was always on notice that Lydon's

claims were directed against it, rather than against another party for whom privity did not exist.

*See Sheller, Ludwig, & Sheller P.C. v. Equitrac*, No. 07-2310, 2008 U.S. Dist. LEXIS 44691, at

*8-9 (E.D. Pa. June 9, 2008) ("Generally, privity of contract is necessary for a party to bring a

breach of contract claim.").  Given such notice, a jury could find that Bock waived its right to

assert the releases by indicating that Lydon's claims had merit despite those releases.

Finally, Bock claims that Lydon is judicially estopped from making its waiver argument.

The parties agree that for judicial estoppel to apply, "the party to be estopped must have taken

two positions that are irreconcilably inconsistent."  *See* Docket No. 31 at 26; Docket No. 33 at

14.  Bock's argument centers on Lydon's preliminary objections to the state court complaint that

Bock filed on May 4, 2011.  In those objections, Lydon noted that Bock's complaint failed to

allege that Lydon had formally submitted a claim against Bock, and therefore argued that Bock's

action was not yet ripe.

Bock appears to believe that Lydon's prior ripeness argument is "irreconcilably

inconsistent" with Lydon's current waiver argument.  However, Lydon's preliminary objections

addressed the allegations (or lack thereof) in Bock's state court complaint, whereas Lydon's

current argument addresses actual evidence of Bock's conduct.  It is not "irreconcilably

inconsistent" for Lydon to (i) point out the insufficiency of Bock's factual allegations; and (ii) in

a subsequent case, identify evidence that it notified Bock of its claim for delay damages.

Therefore, Bock's arguments regarding implied waiver fail, and the Court finds that an issue of fact exists as to whether the releases bar Lydon's claims.[5]

## V. Conclusion

For the foregoing reasons, the Court denies Bock's motion for summary judgment. An Order consistent with this Memorandum follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

[5] At oral argument, the parties agreed that the Court's decision as to whether Bock is equitably estopped from asserting the releases should follow its decision regarding implied waiver. *See* Transcript at 26:17-27:4, 48:9-18, 52:18-22. Therefore, the Court will also deny summary judgment based on Lydon's equitable estoppel argument, and will not address the parties' contentions regarding whether Bock is judicially estopped from asserting the releases. As for the pay-if-paid provision in the parties' contract, Bock's counsel admitted at oral argument that his client cannot win summary judgment based on this provision until the state court determines whether his client caused Lydon's delays. *See* Transcript at 31:17-32:12, 32:22-33:3. However, the Court does note that, contrary to Lydon's assertion in its briefing, the vast majority of Lydon's delay claim is encompassed by the pay-if-paid provision. The pay-if-paid clause pertains to "work/materials invoiced by [Lydon]," and more than $1.7 million of Lydon's claim is based on labor productivity impacts.